STATE of Missouri, Appellant,

v.

Todd MACK, Respondent.

No. SC 83894.

Supreme Court of Missouri,
En Banc.

Feb. 13, 2002.

G. John Richards, Lincoln County Prosecuting Attorney, Troy, for appellant.

Charles F. James, Wentzville, for respondent.

STEPHEN N. LIMBAUGH, JR., Chief Justice.

This is a Fourth Amendment case in which this Court is called upon to determine the admissibility of evidence seized at a certain drug enforcement checkpoint in light of *Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). The defendant, Todd Mack, was stopped at the checkpoint and subjected to a search of his vehicle, and based on the fruits of the search, he was charged with three counts of possession of a controlled substance in violation of section 195.202, RSMo 1994. He filed a motion to suppress the evidence arguing the search and seizure that led to the charges was unconstitutional. The trial court granted the motion to suppress, and the state, pursuant to section 547.200, RSMo 1994, filed an interlocutory appeal in the Court of Appeals, Eastern District. Because of the general interest and importance of the issue presented, the Court of Appeals then transferred the case to this

Court. Mo. Const. art. V, sec. 10. Reversed and remanded.

### I.

On June 24, 1999, a Thursday, the City of Troy police department set up a drug checkpoint on northbound Highway 61 at the Old Cap Au Gris exit in Lincoln County. This exit was selected because it did not provide gas or food services to motorists, and the only reason a motorist would take the exit would be to go to a local high school, a local Catholic church, or one of several residences in the area. There were no activities that Thursday night at the high school or the church. The police set up signs on the highway approximately a quarter mile from the Old Cap Au Gris exit that stated "DRUG ENFORCEMENT CHECKPOINT ONE MILE AHEAD" and "POLICE DRUG DOGS WORKING," intending for drivers to believe that the drug checkpoint was really located at the Highway 47 exit, one exit further than the Old Cap Au Gris exit.

Troy police administered the checkpoint according to a written plan of action entitled "Troy Police Department Drug Enforcement Checkpoint." The plan called for uniformed officers to be stationed at the top of the ramp in order to stop all exiting vehicles, record the driver's license number and registration, and ascertain the occupants' reason for exiting at Old Cap Au Gris. In addition, the officers were to look for any signs of possible drug trafficking, and they were given discretion to interview the driver and passengers separately if they thought it was necessary. If the officers did not find suspicious circumstances that warranted reasonable suspicion of drug trafficking, they released the vehicle and its occupants. However, if circumstances did raise reasonable suspicion, the officers directed the vehicle to the entrance side of the ramp, where one of them asked the driver for permission to search the car. If the driver granted permission, he or she was asked to sign a permission to search form, and the officers then searched the vehicle. If permission was not granted, officers used a drug dog to sniff the exterior of the vehicle, and if the dog indicated the presence of a controlled substance, the vehicle would be searched on that basis instead.

Defendant took the Old Cap Au Gris exit at approximately 11:00 p.m. on June 24 and was stopped at the checkpoint by the Troy police officers. At the suppression hearing, one of the officers described the initial contact as follows:

Q. And at some point in that evening you came into contact with a Todd Mack, right?

A. Yes.

Q. And what was your very first contact with him?

A. The first contact I had with him was it was probably the most obvious veering off of 61 all night. The vehicle—it was dark by then. And the vehicle almost missed the turn. He was going northbound on 61 and all of a sudden veered off onto the off ramp. And that's when I made contact with him.

\* \* \*

Q. When you said he was driving somewhat erratically and exited off the ramp, can you describe in more detail exactly how he took that exit?

A. I remember seeing a vehicle coming toward me which would have been northbound 61. It appeared it was going to continue past the off ramp. And suddenly it shot over and almost missing it came up the off ramp. And he was moving a pretty good pace too.

Once defendant was stopped, he informed the officers that he exited at Old

Cap Au Gris to get to a bar in Troy. The officers observed that defendant was very nervous, had glazed and bloodshot eyes, and smelled of alcohol. When police questioned defendant's passenger, Edward Aschoff, they discovered Aschoff was wanted under an outstanding warrant and placed him under arrest. Defendant then granted permission to search the vehicle, and the officers discovered various narcotics and drug paraphernalia located under the driver's seat. As a result, defendant was charged with possession of methamphetamine, cocaine, and methylphenidate.

Defendant first filed a motion to suppress the evidence on June 20, 2000, arguing, *inter alia*, that the search and seizure were made without a warrant or other lawful authority, as well as without probable cause, and that no exigent circumstances justified the search and seizure. The trial court denied the motion on the basis of *State v. Damask*, 936 S.W.2d 565 (Mo. banc 1996), in which this Court approved a drug checkpoint strikingly similar to the one at issue. Following the denial of the motion, the United States Supreme Court decided *Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), which disallowed evidence obtained through the use of drug checkpoints, absent "individualized suspicion" of wrongdoing. Respondent filed a motion for reconsideration on December 29, 2000, which the trial court granted, later ruling to suppress the evidence. This appeal followed.

On motions to suppress, the state bears the burden of showing that the motion should be denied by a preponderance of the evidence. Sec. 542.296.6, RSMo 2000; *State v. Deck*, 994 S.W.2d 527, 534 (Mo. banc 1999).

## II.

Defendant argues that this case is controlled by *Indianapolis v. Edmond*. The pertinent facts in *Edmond* are as follows: The city of Indianapolis operated vehicle checkpoints at several locations in an effort to reduce and discourage drug trafficking. *Indianapolis v. Edmond*, 531 U.S. at 34, 121 S.Ct. at 450. A short distance from each location, the police posted a sign informing the public that a drug checkpoint was ahead. *Id.* at 35–36, 121 S.Ct. at 451. At each location, the police officers stopped a predetermined number of drivers and required them to produce a driver's license and vehicle registration. *Id.* at 35, 121 S.Ct. at 450. The officers also looked for signs of impairment and conducted an "open-view examination of the vehicle from the outside." *Id.* In addition, a narcotics-detection dog was led around the outside of every stopped vehicle. *Id.*, 121 S.Ct. at 451 Officers were instructed to minimize the detention time of a vehicle if no reasonable suspicion or probable cause existed. *Id.*

The Court began its analysis by distinguishing several cases in which checkpoints were approved, such as those involving border checkpoints "designed to intercept illegal aliens" and sobriety checkpoints "aimed at removing drunk drivers from the road." *Id.* at 37, 121 S.Ct. at 451–52. In contrast, the Court found the primary purpose of the Indianapolis checkpoint was to interdict controlled substances, which the Court considered to be "ordinary criminal wrongdoing." *Id.* at 41–42, 121 S.Ct. at 454. The Court refused to "sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime," *id.* at 44, 121 S.Ct. at 455, and concluded that "[w]hen law enforcement authorities pursue primarily general crime control purposes at checkpoints ...,, stops can only be justified by some quantum of individualized suspicion." *Id.* at 47, 121 S.Ct. 447. The Court held, therefore,

that "[b]ecause the primary purpose of the Indianapolis checkpoint program is ultimately indistinguishable from the general interest in crime control, the checkpoints violate[d] the Fourth Amendment." *Id.* at 48, 121 S.Ct. at 458.

The State contends, however, that the checkpoint in this case is fundamentally different than that in *Edmond* because the required "quantum of individualized suspicion" is present. We agree. In *Edmond,* a predetermined number of vehicles were stopped, apparently at random, at each checkpoint, and there was no attempt to acquire any quantum of individualized suspicion before making the stops. In this case, though, the entire purpose of the checkpoint was to generate the suspicious conduct necessary to constitute "individualized suspicion," and this was done by deceiving drivers who were engaged in criminal activity into exiting the highway so as to avoid the checkpoint they expected to encounter at the next exit.

■■■ The issue here is simply whether the deceptive drug checkpoint scheme does indeed generate the necessary quantum of individualized suspicion. The "individualized suspicion" that will justify the minimally intrusive *"Terry"* stop is present when "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under this standard, it is reasonable to conclude that drivers with drugs would "take the bait" and exit at Old Cap Au Gris to avoid being questioned at the next exit. *See United States v. Brugal,* 209 F.3d 353, 359 (4th Cir.), *cert. denied* 531 U.S. 961, 121 S.Ct. 388,

148 L.Ed.2d 299 (2000) (holding that a driver's evasive behavior in exiting a highway to avoid a ruse drug checkpoint supports a finding of reasonable suspicion).[1] That reasonableness is established by the significant efforts to reduce the legitimate reasons for taking the exit. *See id.* at 359–60. As noted, the checkpoint was set up in an isolated and sparsely populated area offering no services to motorists and was conducted on an evening that would otherwise have little traffic. *See id.* at 360. It bears mention as well that the defendant took the exit at 11:00 p.m., presumably at a time when there was even less reason for local traffic to be on the road. *See id.*

The reasonableness of the officers' conclusions is also supported by the recognition that deceptive drug checkpoints are effective—that drivers with drugs do indeed "take the bait." As this Court observed in the *Damask* case, "the particular checkpoints in question were modeled after previous successful checkpoint operations and were planned in such a way as to increase the likelihood of discovering drug trafficking predictably associated with persons stopped at this type of focused roadblock." *State v. Damask,* 936 S.W.2d at 573. The checkpoint in this case is no different.

Finally, even if the deceptive drug checkpoint scheme did not alone constitute "individualized suspicion," defendant's particular conduct in exiting at the checkpoint must also be considered. *See United States v. Arvizu,* 2002 U.S. LEXIS 490, *16–17, —— U.S. ——, 122 S.Ct. 744, 751, 151 L.Ed.2d 740 (U.S., Jan. 15, 2002) (holding that in evaluating the legitimacy of a stop, courts must consider the "totality of

1. Because there was no challenge in the *Brugal* case to the initial stop—a roadblock at the end of the exit to check for drivers licenses and vehicle registrations—the court's analysis turned on the presence or absence of reasonable suspicion for the continued detention of the defendant after the initial stop. *Id.* at 358.

the circumstances," and factors that "by themselves [are] quite consistent with innocent travel [may] collectively amount[ ] to reasonable suspicion"). According to the officer's testimony, defendant "suddenly veered off onto the off ramp" and "almost missed the turn," as if he made the decision to exit only upon learning that a checkpoint was supposedly ahead. This evidence, when coupled with the deceptive checkpoint scheme, certainly compels a finding of "individualized suspicion." Though the dissent discounts this evidence on the belief that the officers did not rely on the evidence in making the stop, the very reason for introducing the evidence, indeed the *only* reason, was to show that the officers were even more suspicious of this particular driver's conduct.

The recent 8th Circuit case of *United States v. Green*, 2001 U.S.App. LEXIS 27225, 275 F.3d 694 (8th Cir. Dec. 27, 2001), on which the dissent relies is distinguishable. Although the court did hold, on the basis of *Indianapolis v. Edmond*, that a stop made at a very similar deceptive drug checkpoint was an unreasonable seizure, the court did not expressly address the issue raised here—whether the ruse used to lure drivers to the checkpoint gave rise to that "quantum of individualized suspicion" sufficient to justify a *"Terry"* stop and take the case out of the purview of *Edmond*. *Green* is also distinguishable because there was no supplemental evidence of individualized suspicion like the defendant's conduct in suddenly veering off on the exit in the case at hand. Even if *Green* were not distinguishable, general declarations of law made by lower federal courts do not bind this Court. *Hanch v. K.F.C. Nat'l Mgmt. Corp.*, 615 S.W.2d 28, 33 (Mo. banc 1981).

The dissent also cites several cases decided since *Edmond* from other state jurisdictions—*State v. Lidster*, 319 Ill.App.3d 825, 254 Ill.Dec. 379, 747 N.E.2d 419 (2001); *Trent v. Commonwealth*, 35 Va. App. 248, 544 S.E.2d 379 (2001); *Buchanon v. Commonwealth*, 200 Ky.App. LEXIS 1255, 2001 WL 1555654, —— S.W.3d —— (Dec. 7, 2001); *Davis v. State*, 788 So.2d 1064 (Fla.Dist.Ct.App.2001)—but these cases are even less helpful than *Green* because they do not involve "ruse" checkpoints.

### III.

Under these circumstances, the State met its burden of proof to show that the checkpoint stop was not a Fourth Amendment violation. The judgment of the trial court is reversed, and the case is remanded.

HOLSTEIN, BENTON and PRICE, JJ., concur.

LAURA DENVIR STITH, J., dissents in separate opinion filed.

WHITE and WOLFF, JJ., concur in opinion of LAURA DENVIR STITH, J.

LAURA DENVIR STITH, Judge, dissenting.

I respectfully dissent. The seizure of Mr. Mack's car pursuant to the surreptitious drug enforcement checkpoint set up by the police at the Old Cap Au Gris exit was unreasonable under the United States Supreme Court's decision in *Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). The primary programmatic purpose of the checkpoint was to detect general criminal activity—in this case, narcotics trafficking. The state has failed to show that the "ruse" used by police in setting up the checkpoint on the highway off-ramp created the kind of individualized suspicion that *Edmond* teaches is required in order for a drug checkpoint to pass Fourth Amendment scrutiny.

For this reason, the Eighth Circuit has recently held that a Missouri drug checkpoint operated using a nearly identical ruse violates the Fourth Amendment under the principles set out in *Edmond.* *See United States v. Green,* 2001 U.S.App. LEXIS 27225, 275 F.3d 694 (8th Cir. Dec 27, 2001). Even prior to *Edmond,* the Sixth Circuit had rejected the propriety of a very similar ruse checkpoint, finding that it not only failed to create the kind of individualized suspicion required under the Fourth Amendment, but actually caused greater Fourth Amendment concern because its surreptitious nature resulted in unreasonable and unnecessary surprise on the part of law-abiding motorists. *United States v. Huguenin,* 154 F.3d 547 (6th Cir.1998). I would find that the checkpoint at issue here is invalid under *Edmond,* and for that reason would affirm the trial court's grant of Mr. Mack's motion to suppress.

## I. FOURTH AMENDMENT PRINCIPLES

### A. *Edmond* Requires Individualized Suspicion.

The United States Supreme Court specifically held in *Edmond* that the Fourth Amendment protection against unreasonable seizures prohibits "stops justified only by the generalized and ever-present possibility that interrogation" may reveal evidence of criminal activity. 531 U.S. at 44, 121 S.Ct. 447.[1] For this reason, the Supreme Court said, "[w]e have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by *some*

*measure of individualized suspicion."* *Id.* at 41, 121 S.Ct. 447 (emphasis added).

The Supreme Court specifically distinguished drug checkpoints from checkpoints the Court had previously approved for "purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety." *Id.* By contrast, it held that the interdiction of drugs through road checkpoints is not related to highway safety, but is simply intended to detect general criminal activity. *Id.* at 43, 121 S.Ct. 447.

While *Edmond* recognized the serious and alarming dangers created by drug-related activity, it noted that society has similar concerns about the deleterious effects of other criminal activities, "if only to a lesser degree." *Id.* at 42, 121 S.Ct. 447. But, it explained, "the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose." *Id.* The Court concluded:

> We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes. We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime.

*Id.* at 44, 121 S.Ct. 447. Numerous cases have applied *Edmond* and invalidated checkpoints openly set up along our nation's highways and streets where the primary purpose of those checkpoints was to detect general criminal activity. *See, e.g., State v. Lidster,* 319 Ill.App.3d 825, 254 Ill.Dec. 379, 747 N.E.2d 419 (2001) (search for evidence of a crime); *Trent v. Com-*

---

1. "It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment." 531 U.S. at 40, 121 S.Ct. 447.

monwealth, 35 Va.App. 248, 544 S.E.2d 379 (2001) (narcotics); Buchanon v. Commonwealth, 2001 Ky.App. LEXIS 1255, 2001 WL 1555654, —— S.W.3d —— (Dec. 7, 2001) (narcotics); Davis v. State, 788 So.2d 1064 (Fla.Dist.Ct.App.2001) (narcotics). A number of pre-Edmond cases had anticipated its holding and similarly declared invalid checkpoints the primary purpose of which was drug interdiction. See, e.g., United States v. Morales–Zamora, 974 F.2d 149 (10th Cir.1992); Galberth v. United States, 590 A.2d 990 (D.C.1991).

### B. Application of Fourth Amendment Principles to Ruse Drug Checkpoints.

The principal opinion acknowledges that Edmond requires that the police have individualized suspicion in order to set up a checkpoint to catch those engaged in drug-related activity. Op. at 709. It also acknowledges, as it must, that the primary purpose of the checkpoint in the instant case was precisely to catch those engaged in drug-related activity. Op. at 707, 709. But, it fails to explicitly recognize the inescapable fact that this Court's pre-Edmond decision in State v. Damask, 936 S.W.2d 565 (Mo. banc 1996), expressly approving random drug checkpoints without a showing of individualized suspicion, directly conflicts with Edmond.

It is interesting to note that in Damask this Court considered the reasoning of Galberth, supra, that the police may not use a checkpoint to seek evidence of drug-related crimes, but rejected that reasoning because it believed (contrary to Galberth) that the United States Supreme Court's approval of border patrol checkpoints in United States v. Martinez–Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), constituted approval of roadway checkpoints for the purpose of deterring general criminal activity. Damask, 936 S.W.2d at 572. Damask conceded that, "[b]ut for the illegal immigration cases,

one might agree that Galberth correctly states the law," and, so, would be inclined to follow Galberth and disapprove the ruse checkpoint at issue in that case. Damask, Id. at 572.

The approach in Edmond is consistent with the approach of Galberth rather than that of Damask, for Edmond specifically rejected the argument that the Court's prior approval of border patrol checkpoints meant that checkpoints could constitutionally be set up in order to deter general criminal activity. Edmond, 531 U.S. at 37–38, 121 S.Ct. 447. Nonetheless, the principal opinion now holds that the drug checkpoint at issue here, although identical in relevant respects to the one in Damask, passes constitutional muster because "the entire purpose of the checkpoint was to generate the suspicious conduct necessary to constitute 'individualized suspicion,' ... by deceiving drivers who were engaged in criminal activity into exiting the highway so as to avoid the checkpoint they expected to encounter at the next exit." Op. at 709 (emphasis added). Thus, it argues, while in Edmond the stops were random and detained every driver who crossed the checkpoint during certain time periods, here the stops were only of those who had created "individualized suspicion" by exiting the highway at a location where, it presumes, only those engaged in criminal activity would have reason to exit.

It is at this point that I part company with my colleagues. In United States v. Green the Eighth Circuit recently addressed a case in which defendant was arrested at a drug checkpoint very like this one set up at an allegedly remote exit on eastbound Interstate 44. 2001 U.S.App. LEXIS 27225 at 2, 275 F.3d 694, 697. There, as here, the sheriff posted signs a short distance before the exit ramp notifying travelers that a drug checkpoint was one mile ahead, "in an attempt to

divert suspected drug traffickers to the actual checkpoint located at the top of the overpass." *Id.* A driver named Freeman exited at the ramp at 11 p.m., was stopped by police, and offered a suspicious explanation for his exit. He then voluntarily admitted to carrying drugs and consented to a search of the car. Defendant Green was a passenger in Freeman's car. *Id.* at 3, 275 F.3d at 697.

The Eighth Circuit held that *Edmond* had made it clear that, "checkpoints set up for general crime prevention, including drug interdiction do not pass constitutional muster under the Fourth Amendment." *Green, Id.* at 10, 275 F.3d at 699. The Eighth Circuit assumed, for purposes of the appeal, that Mr. Green could show that the checkpoint was set up for the purposes of "general crime control, namely, the discovery of illegal narcotics." *Id.* at 11, 275 F.3d at 700. It held that "with that assumption, the police violated Green's Fourth Amendment right against unreasonable seizure when they stopped Freeman's vehicle and detained Green." *Id.*[2]

While no other appellate courts appear to have addressed the propriety of a ruse checkpoint since *Edmond,* a similar type of ruse was disapproved by the Sixth Circuit in 1998 in *United States v. Huguenin,* 154 F.3d at 547. There, a misleading sign was set up by Tennessee police warning of a Drug/DUI checkpoint one-half mile ahead, whereas the checkpoint was really set up at an exit ramp that the motorist would encounter just after the posted sign and before the supposed location of the checkpoint. *Id.* at 549–550.

*Huguenin* foreshadows *Edmond*'s reasoning, holding that the fact the checkpoint had a secondary purpose of catching drunk drivers did not validate it where the

facts showed its primary purpose was to intercept drugs. 154 F.3d at 554–55. It also held that a ruse such as the one employed there makes a drug checkpoint *more rather than less objectionable,* for:

> while checkpoints must stop motorists on a non-random and neutral basis, in the present case the checkpoint was intentionally set up as a trap, targeting motorists who left the Interstate and who thought they would avoid the highway checkpoint for whatever reason. By using such a ruse and hiding the checkpoint, the Roane County officers did not attempt to minimize the fear and surprise potentially experienced by motorists, but specifically attempted to increase the surprise. An ordinary law-abiding citizen, who perhaps took the exit simply to avoid the unusual process of being stopped on an Interstate highway, could fear that he would be under greater suspicion and subject to more intrusive questions and a thorough search of his car simply because he had chosen to take the exit.

*Id.* at 561. For this reason, the stop was therefore more subjectively intrusive on the rights of the vast majority of those stopped at the exit who turned out to be law-abiding motorists. *Id.* The Sixth Circuit disapproved of the stop and suppressed the evidence.

The principal opinion suggests that the Fourth Circuit has approved a "decoy" drug checkpoint in *United States v. Brugal,* 209 F.3d 353, 359 (4th Cir.), *cert. denied,* 531 U.S. 961, 121 S.Ct. 388, 148 L.Ed.2d 299 (2000). But, as the principal opinion acknowledges, the portion of *Brugal* that it discusses actually deals with the separate question whether the police could

**2.** The Court went on to hold that the drugs were admissible because the drugs were not discovered due to the illegal seizure of Mr.

Green but due to the independent and voluntary consent of the driver, Freeman, to the search of his car. *Id.*

consider the driver's behavior in exiting the highway and his suspicious conduct during questioning in deciding whether they had developed a sufficient basis for a further detention and search after the initial stop. *Brugal* does not state that exiting at a ruse checkpoint in itself provides the kind of reasonable suspicion needed to justify an initial seizure. To the contrary, it specifically notes that, because defendants had conceded "that the police established a valid license checkpoint, we need not address the validity of the initial stop." *Id.* For these reasons, *Brugal* provides no authority for concluding that *Edmond*'s proscription of checkpoints that are simply part of the "ordinary enterprise of investigating crimes" would not apply to a ruse checkpoint such as the one in this case. *Individualized* suspicion was required for the *initial* stop of Mr. Mack, but it was not present here.

## II. APPLICATION OF FOURTH AMENDMENT PRINCIPLES TO MACK

### A. Subjective Good Faith of Police is Insufficient.

The principal opinion is in conflict with the principles set out in *Edmond* and applied in cases such as *Green* and *Huguenin*. The principal opinion holds that the stop of Mr. Mack is based on "individualized suspicion" and so is constitutional because, in an effort to limit those stopped to persons engaged in criminal activity, the police tried to set up the checkpoint so as to avoid as much as possible detaining local residents and others who might have a non-criminal basis for exiting the highway. Op. at 709.

But, accepting the principal opinion's view as to the motivation behind the ruse used by police, *Edmond* makes it unmistakably clear that subjective good intent is irrelevant and can "play no role in ordinary, probable-cause Fourth Amendment analysis." 531 U.S. at 45, 121 S.Ct. 447. Rather, the Fourth Amendment inquiry is an objective one that must focus on what *Edmond* calls the "programmatic purposes [that] may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion." *Id.* at 45–46, 121 S.Ct. 447.

In other words, our inquiry is not whether the police *subjectively tried* to create a basis for individualized suspicion by setting up the drug checkpoint on a seldom used off-ramp late at night in an area without services. Rather, the inquiry is whether the way the drug checkpoint was in fact set up, *considered objectively*, created the kind of individualized suspicion required by *Edmond*. The answer to that question is no, it did not create such individualized suspicion, for numerous reasons.

### B. Edmond Requires Individualized, Not Group, Suspicion.

Most basically, it is a contradiction in terms to say that police had a basis for "individualized" suspicion of a motorist by setting up a checkpoint that had the admitted *programmatic* purpose of searching for those engaged in drug-related activity, yet stopped *all* those who exited the highway at a certain point. Here, the record below indicates that some 60 to 150 cars exited during this drug checkpoint's operation. Under the principal opinion's approach, a suspicion therefore arose as to all 60 to 150 exiters, based solely on the fact that they had exited the highway after, presumably, seeing the drug checkpoint sign. This type of suspicion is hardly "individualized." If the Court approves this procedure today, it, in effect, will have approved "group suspicion" as a basis for stopping each individual in the group. Neither *Edmond* nor any other Supreme Court case, nor the Fourth Amendment,

support such a basis for approval of a drug checkpoint.

### C. The Relative Effectiveness of a Law Enforcement Procedure Does Not Determine its Constitutional Validity.

Even if one could look at the reasons why this "group" of motorists exited the highway as a whole and could consider the effectiveness of the checkpoint's "bait and switch" approach in separating criminals from law-abiding citizens, the approach taken by the principal opinion would be flawed. Such an approach is in conflict with the admonition of the United States Supreme Court in *Michigan v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), that courts must not consider the relative effectiveness of a chosen path of law enforcement activity in determining its constitutional propriety. So long as the technique employed is reasonable, the decision whether to use it or some other approach, whether more or less effective, is left in the hands of law enforcement officials. *Id.* at 453–54, 110 S.Ct. 2481.

All members of this Court would no doubt agree that, applying this rule, a court should not disapprove an otherwise constitutional seizure on the basis that it is not as effective as some other approaches. But, conversely, it follows that neither can a court approve an otherwise *unconstitutional* seizure—such as one made at a drug checkpoint—on the basis that it is more effective at creating "group suspicion" than is the alternative approach disapproved in *Edmond.*

As applied here, this means that the principal opinion's attempt to distinguish *Edmond* on the basis that it involved random seizures of all those who drove down a highway, whereas here the police stopped only those who drove off an exit ramp after being warned of a drug check-

point, is of no avail. It is simply an attempt to compare the effectiveness of various law enforcement techniques. While an interesting issue for academic study, it cannot make constitutional a seizure that intrinsically fails to meet Fourth Amendment standards.

### D. Ruse Checkpoints Are Not so Effective as to Distinguish Them from Other Drug Checkpoints.

Although not stated as such, the principal opinion, in effect, tries to avoid this fundamental flaw in its approach by arguing that the technique used here is so effective that it goes beyond being merely a more effective law enforcement technique, and enters a new level, itself becoming the basis for a finding of "individualized suspicion." Neither the record, nor common human experience as to the behavior of a group of persons in the fact situation in this case, supports the principal opinion's assumption that only those engaged in criminal activity would "take the bait" and exit the highway at Old Cap Au Gris in response to the subterfuge the police employed here.

Indeed, even if *Edmond* permitted the police to avoid its bar on drug checkpoints and create "individualized" suspicion by organizing a "group" drug checkpoint specifically targeted at criminals, it would be the state's burden to show that it had done so and so should be exempt from the general prohibition on drug checkpoints set down in *Edmond* and its progeny. Sec. 542.296.6. This record simply does not permit such a finding, for the police testimony as to their activities is so vague, inexact and at times self-contradictory that no firm numbers can be determined as to how many cars exited or as to how many arrests were made.[3]

---

**3.** In the instant case, of the 60 to 150 cars   that left the highway, 46 drivers were talked

This Court's opinion in *Damask* does contain information about the success of the ruse drug checkpoint in that case, but it shows that the checkpoint there was far less effective in targeting drug or other criminal activity than was the one disapproved as a fishing expedition in *Edmond*. In *Edmond*, 1,161 vehicles were stopped and 104 motorists were arrested; 55 of those arrests were drug-related and the remainder were not. The Supreme Court noted that "the overall 'hit rate' of the program was thus approximately nine percent," somewhat over half of those arrests being for drugs. 531 U.S. at 35, 121 S.Ct. 447.

In *Damask*, by contrast, approximately 66 cars that exited the highway after seeing the misleading sign were stopped. Of those, ten were searched, and only one person, the defendant, was arrested. This is an arrest ratio of 1.5%.[4] 936 S.W.2d at 568. Even if one assumes that this arrest ratio was unusually low and that the ratio in the instant case, although unclear, would be higher, it must be recalled that the Supreme Court found a nine percent "hit rate" in *Edmond* to be inadequate to create "individualized suspicion." Whatever the average hit rate may be in Missouri ruse checkpoints, it is clear that it is not sufficient to make them more than just another police technique; it is not enough

to elevate ruse checkpoints to the next level, so that the ruse itself creates the kind of individualized suspicion required by *Edmond*.

### E. Why Law–Abiding Citizens Might Exit Before the Checkpoint.

However suspicious exiting a highway before a drug checkpoint sounds like it should be when considered at first blush, the reasons that it is not a proper basis for targeting criminal activity become evident upon further analysis. It is not only criminals who may wish to avoid unwanted contact with the police. A motorist encountering a sign warning of a drug checkpoint ahead may have any number of legitimate reasons not to travel through that checkpoint.

The reasons for desiring not to encounter a checkpoint could range from a desire to get to one's home or other area destination, to a desire to avoid having to deal with a delay in one's travel plans, to a fear of the police due to prior unpleasant encounters with other officers in the past. The latter may particularly be true where the driver is not from the area where the checkpoint is located and fears that, as an outsider, he or she may be a target. The driver may be a member of an ethnic minority and be concerned about being treated unfairly due to racial or ethnic profiling, particularly where, as in the case

---

to by police and 25 "or more" were detained so that a search could be made. Officer Torres at some points indicates that he was not sure how many drug arrests, or arrests of any kind, were made, but when pressed, he recalled some five drug-related arrests, including defendant's and four arrests for misdemeanor drug offenses. No drug traffickers were apparently tricked into exiting at the checkpoint. It appears that there were also five or six other arrests for non-drug offenses such as no registration, outstanding warrants or drunk driving. But, as there are no firm figures on arrests, and as the estimate of the number of cars that went through the check-

point varied so widely, no meaningful percentages can be determined.

This inexactness actually highlights a separate problem with the checkpoint, as the Supreme Court has made clear that a checkpoint must be operated according to well-established, standardized procedures in order to be valid. *Martinez–Fuerte*, 428 U.S. at 559, 565–66, 96 S.Ct. 3074. While this checkpoint had a written plan, its record-keeping appears quite haphazard.

4. *Damask* also involved a second case, but numbers of arrests and cars stopped in it are not contained in the published opinion.

of a drug checkpoint, the very purpose of the stop is to elicit signs of suspicious behavior. Or, as stated by the Sixth Circuit in invalidating a ruse stop similar to the one employed here, an ordinary law-abiding citizen might take the exit simply to avoid the unusual process of being stopped on the Interstate highway. *Huguenin*, 154 F.3d at 561.

Moreover, it must be remembered that the drug checkpoint that the police made drivers believe was one mile ahead on the highway itself would have been unconstitutional under *Edmond*, which invalidated just such checkpoints precisely because they were not based on individualized suspicion of criminal activity. There is something fundamentally unsettling and counter-intuitive about labeling as suspicious a person's conduct in avoiding the state's own unconstitutional conduct. The driver would be put in a "Catch–22" of either proceeding down the highway and being stopped at an unconstitutional checkpoint, or exiting to avoid it and risk being stopped at a ruse checkpoint set up to catch those who had exited. The public should not be put to such a choice.

Other courts dealing with the issue of whether individualized suspicion is created by the action of an individual car in turning around as it approaches a sobriety or drug checkpoint express similar concerns about stopping motorists who have legitimate reasons not to wish to encounter police. For instance, *State v. Bryson* stated, in the context of deciding that the driver's turn shortly before a checkpoint did not in that context raise a reasonable suspicion of criminal activity:

> This conclusion is reflective of the realization that citizens will avoid contact with police for reasons other than fear of being caught for a crime they have committed. A completely innocent person may wish to avoid the delay which a discussion with police may entail; others have a fear of police authority; still others resent and seek to avoid the "hassle" of a stop which lacks any basis.

142 Ohio App.3d 397, 755 N.E.2d 964, 969 (2001). *See also State v. Talbot*, 792 P.2d 489, 495 (Utah App.1990) ("We decline to adopt the position that avoiding a roadblock creates an articulable suspicion for a stop. We see no distinction between the person who avoids confrontation at a roadblock and one who avoids confrontation with an officer under any other scenario").[5]

Fears such as those just mentioned are particularly likely to occur where, as here, the checkpoint is set up at night, in a remote area, and is come upon by surprise. This was the very reason that Judge White dissented from this Court's decision to approve the checkpoints in *Damask*. 936 S.W.2d at 575. He cautioned that the surreptitious nature of the drug checkpoints in that case made them more comparable to the roving patrols disapproved of by the United States Supreme Court in

5. Courts such as *Talbot* have struggled with the issue whether individualized suspicion is created when a car turns around after it has come in sight of a sobriety checkpoint. Most appear to have resolved this issue on a case-by-case basis, that is, by looking at the individual case and deciding if specific—that is, *individualized*—suspicion existed in that particular case. The courts consider such matters as how close to the checkpoint the car was when it turned around, whether there might be other legitimate reasons for turning around, whether the turn itself violated traffic laws, and so forth. Some stops are found proper, and others are not. *See, e.g., State v. D'Angelo*, 605 A.2d 68, 70–71 (Me.1992); *State v. Powell*, 591 A.2d 1306, 1308 (Me. 1991); *Bryson*, 755 N.E.2d at 968–69; *Commonwealth v. Scavello*, 557 Pa. 429, 734 A.2d 386, 388 (1999); *Howard v. Voshell*, 621 A.2d 804, 807 (Del.Super.Ct.1992); *Talbot*, 792 P.2d at 492, 494–95; *Snyder v. State*, 538 N.E.2d 961, 965–66 (Ind.Ct.App.1989).

*Delaware v. Prouse,* 440 U.S. 648, 653–654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), than to the fixed checkpoint stops that can be seen on an open highway, alerting drivers with lighted signs, and that are surrounded by police cars and other stopped vehicles. *Id.* at 577. Checkpoints secretly set up on an exit ramp have no such notice, and, Judge White noted, serious concerns are raised by "the intrusiveness of these stops to law-abiding citizens." *Id.* He concluded that "[i]t is difficult to envision a scenario more likely to engender fright or confusion in an innocent highway traveler....". *Id.*

Justice Stevens raised related concerns in his dissenting opinion in *Michigan v. Sitz* in discussing the validity of sobriety checkpoints:

> These fears are not, as the Court would have it, solely the lot of the guilty ... [t]o be law abiding is not necessarily to be spotless, and even the most virtuous can be unlucky. Unwanted attention from the local police need not be less discomforting simply because one's secrets are not the stuff of criminal prosecutions. Moreover, those who have found—by reason of prejudice or misfortune—that encounters with the police may become adversarial or unpleasant without good cause will have grounds for worrying at any stop designed to elicit signs of suspicious behavior. Being stopped by the police is distressing even when it should not be terrifying, and what begins mildly may by happenstance turn severe.

496 U.S. at 465, 110 S.Ct. 2481.

While the majority in *Sitz* found sobriety checkpoints nonetheless valid because of the interest in getting impaired drivers off the highway, *Edmond* found that drug checkpoints such as this one do not serve such a road-related safety purpose. 531 U.S. at 43, 121 S.Ct. 447. Therefore, here, the other reasonable explanations for exiting the highway take on even added weight, for this is a drug checkpoint, not a sobriety checkpoint, and the general rule requiring proof of individualized suspicion is fully in force.[6]

The record in this particular case bears out these concerns. While the police testified that they initially picked this exit because they believed that few people would have a legitimate reason to take it as there were no services there and the only public buildings in the area, a church and a school, had no activities occurring, the record shows that there were numerous legitimate reasons why local residents would take that exit.

Not only were there residences in the area, but the road off the exit led to downtown Troy. Testimony was offered that Mr. Mack lived in a nearby town, that he and his passenger were on their way to a bar in Troy, and that, while the Old Cap Au Gris exit was not the most direct route to the bar, it was one of up to four routes to Troy and, depending on traffic, could be as quick as the other available routes to Troy from Mr. Mack's home. Officer Torres confirmed that taking the Old Cap Au Gris exit was a reasonable way for Mr. Mack to go from his home to the Troy bar. The motion court was free to believe this testimony showing that Mr. Mack did have a legitimate alternative reason to exit the

---

**6.** In addition, we are dealing not with an individual who clearly turns around to avoid a checkpoint, which in a particular case might be sufficient to create individualized suspicion of wrongdoing, but with suspicion based on the fact that Mr. Mack, a local resident, was one of between 60 and 150 cars to take the Old Cap Au Gris exit between 8 p.m. and 2 a.m. on the night of the roadblock. Such generalized conduct by its very nature cannot provide the kind of individualized suspicion required by *Edmond.*

highway, other than avoiding a drug checkpoint.

Mr. Mack was not alone in having possible non-criminal reasons for taking the Old Cap Au Gris exit. On two or three occasions when the checkpoint was first in operation the exit was so popular that the exit ramp became full and cars were lined up, stopped, into the travel lanes of the highway. Officer Torres estimated that, because of the traffic, an officer approached only 46 of the cars that exited the highway during the checkpoint's operation; the many other cars that had also exited were simply waved through the checkpoint without even a glance by police, so far as the record shows.[7]

This is very similar to the approach disapproved as "random" in *Edmond.* There, as here, the police stopped a group of cars on the highway, let others pass freely while police talked with the drivers of the stopped cars and, if deemed appropriate, searched them. They then stopped another group of cars and repeated the process. 531 U.S. at 35–36, 121 S.Ct. 447. Those passing in the interim were simply allowed to proceed. *Edmond* found this approach did not satisfy the individualized suspicion requirement of the Fourth Amendment. *Id.* at 44, 121 S.Ct. 447.

Here, too, the police's own conduct demonstrates that their approach did not satisfy the individualized suspicion requirement of the Fourth Amendment. That is, if the police really believed that all those who exited the highway after seeing the misleading drug checkpoint sign were in fact criminals, then one can hardly believe that they would have permitted between half and two-thirds of them to simply drive on

without even a preliminary assessment as to whether the car contained drugs or whether a further detention and search were otherwise needed.

Assuming, as the Court must, that the police would not simply let persons reasonably suspected of criminal activity go on their way without being at least briefly questioned, the fact that police were willing to send those cars on their way is a strong indicator that the police did not really form an individualized suspicion of criminal activity from the mere fact that the cars exited at Old Cap Au Gris. They merely had a hunch, and one that was weak enough that it was not worth pursuing if it would block the passage of other cars on the highway. They did not have the kind of individualized suspicion the Fourth Amendment requires.

This is confirmed by the way the police treated the drivers who were stopped at the top of the exit ramp. If the police had a reasonable, individualized suspicion that each driver was engaged in drug-related activity, then the police would have treated each as they usually treat those being stopped for possible drug offenses. They would have, for instance, approached the cars with caution and frisked the occupants for weapons. Instead, the procedures used called for two officers to be initial contacts. One officer would approach the car and talk with the occupant about where he or she was going and why he or she had exited. The second officer was on the ramp, but he was taking down license plate numbers and similar information on a clipboard that was in his hands. If the first officer was engaged with a driver, the second officer would talk to the

---

7. Officer Torres, who was in charge of setting up the checkpoint, testified that approximately 80 cars exited the highway at this supposedly unused exit during the period from 8 p.m. to 2 a.m. when the checkpoint was in operation. He also said he was "not sure if we're getting a good number on 80," however, and other officers' estimates of the number of cars that took the exit ranged from "60 to 70" to 150.

next driver once he had written down the needed information on his clipboard. The second officer thus was not acting in the kind of backup capacity that an officer would assume in approaching a drug-related arrest. In Mr. Mack's case, in particular, the second officer said he was concentrating on what he was writing and did not listen to Mr. Mack's responses. Only if the officer who approached the car saw something suspicious would the driver be asked for permission to search.

In other words, the police did not treat those stopped as if they suspected them of criminal activity when they first stopped them, for merely exiting the highway did not itself provide the police with a basis for an individualized suspicion of criminal activity. Rather, they just stopped the cars and engaged the drivers in conversation to see whether they could develop some basis for an individualized suspicion once the car was already stopped. Such a fishing expedition is not, of course, permissible.

### F. Police Did Not Stop Mr. Mack Because He Swerved.

In a final attempt to avoid the effect of the invalidity of this checkpoint under *Edmond*, the principal opinion asserts that the police had individualized suspicion as to Mr. Mack because he swerved when he left the highway. But, this is an after-the-fact rationalization made to justify a stop that was clearly based on the fact that Mr. Mack exited the highway at the Old Cap Au Gris exit. While the police said that they noticed Mr. Mack swerved to get off at the exit ramp at the last minute, they nowhere suggested that this played any part in their seizure of him. As the principal opinion notes, the state did introduce evidence of this swerving at trial, but the

issue is not whether the state recognized at trial that it needed an alternative ground to support the stop but whether the police actually had an alternative ground for the stop at the time Mr. Mack was seized by them at the top of the Old Cap Au Gris exit. They did not. The record is clear that they stopped—that is, seized—Mr. Mack's car because he exited, not due to the alleged swerve.[8]

Thus, even if the police could have stopped Mr. Mack for swerving off of the road, that is simply not why they stopped him. And, even had it provided a secondary reason for the stop (and the record shows that it did not), *Edmond* is clear that where the primary purpose of a stop is generalized criminal activity, the stop fails to pass constitutional muster. 531 U.S. at 44, 46–47, 121 S.Ct. 447. Any after-the-fact attempt to make his manner of exiting a basis for the stop would be to attribute to the police a motive they did not have.

### III. CONCLUSION

For these reasons, I conclude that the fact the drug checkpoint in this case was set up as a ruse is not sufficient to take it out of the category of drug checkpoints disapproved in *Edmond*, for it does not create the type of "individualized" suspicion that the Fourth Amendment requires. Therefore, the seizure of Mr. Mack's car does not pass constitutional muster under the Fourth Amendment. The trial court's grant of Mr. Mack's motion to suppress should be affirmed.

---

**8.** Of course, as in *Brugal*, the police could consider the fact that Mr. Mack swerved, as well as the fact that he got off at the checkpoint, along with other relevant factors, such as his possession of an open can of alcohol, in deciding whether they had developed sufficient suspicion during the stop to detain him further and subject him to a search. But, the issue before us today is only whether the initial stop was justified.