# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2288

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri |
| Salwan Yousif, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  March 12, 2002

Filed:  October 7, 2002

_____

Before McMILLIAN, HEANEY, and MORRIS SHEPPARD ARNOLD,
     Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Salwan Yousif appeals from a final judgment entered in the United States
District Court for the Eastern District of Missouri upon his conditional plea of guilty
to one count of possession with intent to distribute more than 100 kilograms of
marijuana, in violation of 21 U.S.C. § 841(a)(1).  On appeal, Yousif challenges the
district court's denial of his motion to suppress physical evidence and statements
obtained by law enforcement officers when his vehicle was stopped and searched at
a drug interdiction checkpoint.  For reversal, Yousif argues that, although the district
court correctly held that the drug interdiction checkpoint program violated the Fourth

Amendment under <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32 (2000) (<u>Edmond</u>), and that he was stopped illegally, the district court erred in concluding that he voluntary consented to the search of his vehicle so as to purge the taint of the primary illegality. The government argues, in response, that no Fourth Amendment violation occurred and, even if one did, the district court correctly held that Yousif's voluntary consent to the search of his vehicle purged the taint of the constitutional violation. For the reasons discussed below, we hold that the district court erred in denying Yousif's motion to suppress. Accordingly, we vacate the judgment of the district court and remand the case to the district court for further proceedings consistent with this opinion.

## Jurisdiction

Jurisdiction in the district court was proper based upon 18 U.S.C. § 3231. Jurisdiction in this court is proper based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(b).

## Background

On April 27, 2000, Yousif was indicted in the district court on one count of possession with intent to distribute over 100 kilograms of marijuana. Yousif moved to suppress physical evidence and statements, and the matter was referred to a magistrate judge. Based upon the evidence presented at an evidentiary hearing, the magistrate judge issued a report containing detailed findings of fact and recommended conclusions of law. <u>United States v. Yousif</u>, 4:00 CR 208 (E. D. Mo. Sept. 15, 2000) (<u>Yousif</u>) (hereinafter "Mag. Rep. I") The following is a summary of the background facts, as found by the magistrate judge. <u>Id.</u> at 1-8.

On April 13, 2000, the Missouri Highway Patrol (MHP) and the Phelps County Sheriff's Department set up a drug interdiction checkpoint at the end of the exit ramp leading uphill from eastbound Interstate Highway 44 ("I-44") to Sugar Tree Road in Phelps County, Missouri (hereinafter "the Sugar Tree Road checkpoint". The Sugar Tree Road checkpoint was a so-called "ruse checkpoint" because signs were placed along the highway warning travelers that they were approaching a drug checkpoint further down the highway, yet the checkpoint was actually located on the ramp which exited the highway a short distance past the signs. The Sugar Tree Road exit was chosen as a site for a ruse checkpoint because law enforcement officers believed that I-44 was a commonly used route for transporting drugs, there was little use of the Sugar Tree Road exit for commercial or local traffic, and the end of the ramp was not visible from the highway.

Operation of the Sugar Tree Road checkpoint was governed by a set of standard procedures set forth in a memorandum issued by the MHP on April 4, 2000 (hereinafter "the MHP memorandum"). Pursuant to the MHP memorandum, the following procedures were implemented. Approximately one-quarter mile west of the Sugar Tree Road exit, signs were placed on each shoulder of the road, stating: "Drug Enforcement Checkpoint 1/4 Mile Ahead." Further down the road, approximately 100 yards west of the Sugar Tree Road exit, more signs were placed alongside of the road, stating: "Drug Dogs in Use Ahead." The checkpoint was set up at the end of the Sugar Tree Road exit ramp, out of view from I-44. At least two fully marked MHP patrol cars were located at the checkpoint. When a vehicle would arrive at the checkpoint, at least one uniformed officer would approach the driver and ask for his or her driver's license, registration, and – if required by the state of registration – proof of insurance. The officer would also record the license plate number of the vehicle and ask the driver if he or she saw the signs and why he or she exited the highway. Upon perceiving any indication of illegal activity, the officer would question the driver further. If there were any reason to believe that the vehicle contained illegal drugs or other contraband, the officer would ask for consent to

search the vehicle. If consent were denied, but the officer still had a reasonable suspicion of unlawful activity, the officer would ask the occupants to step out of the vehicle. The officer would then turn off the ignition and have a drug dog walk around the exterior of the vehicle. If the dog failed to alert, and the officer had no other reason to hold the vehicle and its occupants, they would be allowed to leave.

On April 13, 2000, officers with the MHP and Phelps County Sheriff's Department had set up the Sugar Tree Road checkpoint as described above. Shortly before 3:00 p.m., MHP Patrolman Richard Lisenbe observed Yousif's Ford Explorer with Oklahoma license plates turn from I-44 onto the Sugar Tree Road exit ramp. Lisenbe was dressed in uniform and standing with other officers at the top of the ramp. A sign indicating the presence of a police checkpoint, as well as two MHP patrol cars, were clearly visible to the vehicle as it approached the end of the Sugar Tree Road exit ramp. The Explorer slowed, coming nearly to a stop halfway up the ramp. Lisenbe waved his arm directing the driver, Yousif, to proceed forward. After the Explorer stopped at the checkpoint, as directed, Lisenbe and two other officers approached the vehicle. Upon reaching the open driver's side window, Lisenbe noticed a strong berry-like odor. Lisenbe asked Yousif for his driver's license, registration, and proof of insurance. Yousif produced an Arizona driver's license and a rental agreement for the vehicle. According to Lisenbe, Yousif's hands were shaking and he nearly dropped his license as he was trying to hand it over. Lisenbe considered it unusual for a rental car to have such a strong odor. When Lisenbe asked Yousif why he had exited the highway, Yousif's wife, who was in the passenger seat, volunteered that they had exited to let their dog relieve itself.

Lisenbe asked Yousif if he had anything illegal in the vehicle, including narcotics. Yousif said he did not. Lisenbe then asked Yousif if he consented to a search of the vehicle and its contents, and Yousif told him to go ahead. At that point, Yousif's wife asked Lisenbe if he could search without a warrant. Lisenbe replied, in Yousif's presence, that the police could conduct a search if they were given

-4-

consent or had probable cause. Yousif's wife then said: "That's OK, I was just asking." No threats or promises were made by any of the officers in order to obtain Yousif's consent to the vehicle search, and neither he nor his wife objected.

Lisenbe opened the back of the Explorer and found six large black suitcases under a blanket and pillows. Inside the suitcases were bundles of green plant material appearing to be marijuana. Lisenbe then placed Yousif and his wife under arrest and advised them of their Miranda rights. Lisenbe asked them if they understood these rights, and they said that they did. Lisenbe asked Yousif and his wife if they wanted to cooperate with investigators, and Yousif said he did. Lisenbe motioned over two plain-clothed police officers. In Yousif's presence, Lisenbe informed the two officers that marijuana had been found in the car, that Yousif was willing to make a statement, and that Yousif had been read his Miranda rights. Yousif said nothing. Lisenbe also showed the officers the marijuana found in the back of the Explorer.

The two officers walked Yousif to a motor home which the officers were using as an on-site office. Inside the motor home, one of the officers began questioning Yousif, and Yousif began providing information regarding his involvement with the marijuana. While the interview was proceeding, Lisenbe interrupted and stated that, because of the need to secure the marijuana, they should continue the interview at the Highway Patrol Troop I Headquarters in Rolla, Missouri. Accordingly, Yousif, his wife, and the Explorer were taken to the Troop I headquarters in Rolla, where the interview was resumed.

While Yousif was being questioned by one of the officers at the Troop I headquarters, Yousif asked whether he should speak with an attorney. The officer responded that he had a right to speak with an attorney and, if he so desired, the interview would be terminated. The officer further stated: "That was told to you when you were read your rights." At that point, Yousif denied having been read his Miranda rights. The officer then reminded him that he had been read his Miranda

rights by Lisenbe while they were at the Sugar Tree Road checkpoint. Yousif again denied having been advised of his rights. The interviewing officer then sent another officer to find Lisenbe, to specifically ask Lisenbe whether Yousif had been read his Miranda rights. Lisenbe confirmed that he had. The officer questioning Yousif read Yousif his Miranda rights a second time, and again asked him if he understood them. Yousif said that he did and indicated that he wanted to continue with the interview. Afterward, Yousif twice inquired during the interview about the deal he would receive in exchange for the information he was providing. Each time he was told that the prosecutor would make that determination upon assessing the information Yousif was providing. The second time, Yousif stated that, if he could not be assured of a deal, he did not want to cooperate. At that point, the interview was terminated.

Based upon these facts, the magistrate judge concluded that: (1) the stop of Yousif's vehicle at the Sugar Tree Road checkpoint did not violate the Fourth Amendment and (2) Yousif's consent to the search of his vehicle was voluntary. Mag. Rep. I at 11-15. Accordingly, the magistrate judge recommended that the motion to suppress be denied. Yousif objected to the magistrate judge's report and recommendation. By order dated October 18, 2000, the district court adopted the magistrate judge's report and recommendation and denied Yousif's motion to suppress. Shortly thereafter, however, the United States Supreme Court issued its decision in Edmond, 531 U.S. at 40-48, holding that drug interdiction roadside checkpoints being used by the City of Indianapolis violated the Fourth Amendment because they resulted in seizures that were not based upon individualized reasonable suspicion and were set up by law enforcement officers for the primary purpose of interdicting narcotics traffic, which, the Court explained, was essentially for the purpose of general crime control.[1] Yousif thereafter moved in the district court for

_____

[1]The Supreme Court distinguished the drug interdiction checkpoints at issue in City of Indianapolis v. Edmond, 531 U.S. 32, 41 (2000) (Edmond), from those which were for "purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety," which the Court had previously approved.

reconsideration of his motion to suppress. The district court granted the motion and referred the matter back to the magistrate judge.

Upon reconsideration in light of Edmond, the magistrate judge again recommended denial of Yousif's motion to suppress. The magistrate judge distinguished the case at bar from Edmond on the ground that, in the present case, the police *did* have an individualized reasonable suspicion of illegal activity based upon Yousif's conduct as he approached the Sugar Tree Road checkpoint. Thus, the magistrate judge concluded that the initial seizure was not unconstitutional under the particular facts of this case. The magistrate judge reasoned:

> [D]efendant Yousif's turning off Interstate 44, onto the Sugar Tree Road exit, after seeing the drug checkpoint signs, reasonably indicated to the officers that he was attempting to evade the police drug checkpoint investigation . . . . This suspicion that defendant was evading the police was bolstered by the officer's observation that, as he drove up the Sugar Tree Road exit ramp, in a vehicle with out-of-state license plates, defendant slowed his vehicle almost to a stop half-way up the ramp. The officer then had to wave his arm and direct Yousif to continue driving up the ramp to the checkpoint before he did so. Common sense indicates that defendant possibly was evading police detection of his illicit drug activity.

Yousif, slip op. at 13 (Dec. 12, 2000) (hereinafter "Mag. Rep. II") (citing Illinois v. Wardlow, 528 U.S. 119 (2000) (Wardlow)[2]). In any event, the magistrate judge

---

[2]In Illinois v. Wardlow, 528 U.S. 119 (2000), the Supreme Court held that a Terry stop was sufficiently supported by reasonable suspicion of criminal activity where the defendant was in an area known for heavy narcotics trafficking and fled without provocation upon noticing that police were patrolling the area. The Court reasoned: "Headlong flight–wherever it occurs–is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. at 124.

reasoned, even if the stop was unlawful under Edmond, the government had met its burden to prove that the evidence was admissible based upon Yousif's consent to the search of the vehicle. That independent and voluntary consent, the magistrate judge concluded, was sufficient to purge the evidence in question of any taint resulting from the initial seizure. Mag. Rep. II at 13-14. Yousif filed objections to the magistrate judge's second report and recommendation.

Upon review, the district court disagreed with the magistrate judge's conclusion that the officers had sufficient individualized suspicion to justify the stop of Yousif's vehicle at the Sugar Tree Road checkpoint. The district court held that the Sugar Tree Road checkpoint was itself "clearly illegal" under Edmond and, moreover, that the Supreme Court's holding in Edmond could not be "avoided" simply by relying on "factual indicators" which purportedly established individualized reasonable suspicion that Yousif was transporting drugs. Yousif, slip op. at 2 & n.1 (Jan. 8, 2001) (hereinafter "District court order"). The district court explained: "All of these indicators, [i.e.,] Defendant's initial hesitation when he exited Interstate 44 and encountered the checkpoint, Defendant's nervousness and shaking when questioned by Sergeant Lisenbe, and the overwhelming berry-scented air freshener, would not exist but for the illegal checkpoint." Id. Therefore, the district court concluded: "the officers did not have independent individualized suspicion that would overcome the illegality of the drug interdiction checkpoint." Id. (citing Wardlow).

However, the district court agreed with the magistrate judge's finding that Yousif's voluntary consent to the search of his vehicle nevertheless provided an independent basis for denying the motion to suppress. See id. at 3 ("The Eighth Circuit has consistently held that voluntary consent purges the taint of an illegal search and seizure. . . . The Court adopts the Magistrate Judge's factual findings with respect to Defendant's consent and finds that defendant freely gave his consent to

search the truck.") (citations omitted). Accordingly, the district court denied Yousif's motion to suppress. Id.

Thereafter, Yousif entered a conditional plea of guilty, and the district court sentenced him to thirty-seven months in prison, four years supervised release, and a special assessment of $100. This appeal followed.

## Discussion

Yousif argues on appeal that the district court erred in denying his motion to suppress. He maintains that, under Edmond, his Fourth Amendment rights were violated when he was stopped and detained at the Sugar Tree Road checkpoint and, moreover, the apparent consent he gave for the subsequent search of his vehicle and his apparent waiver of Miranda rights prior to making incriminating statements were not sufficiently attenuated from the unlawful seizure to purge the taint of the constitutional violation. Therefore, he concludes, the marijuana discovered in the Explorer and the statements he made to the officers were fruits of the poisonous tree and subject to exclusion under Wong Sun v. United States, 371 U.S. 471 (1963) (Wong Sun).

In response, the government asserts the following alternative grounds for affirming the district court's ruling: (1) the Sugar Tree Road checkpoint was not illegal under Edmond; (2) even if it was, Lisenbe had reasonable suspicion under the totality of the circumstances to stop Yousif's vehicle before it ever reached the Sugar Tree Road checkpoint; and (3) even if the initial stop and detention were illegal, any resulting taint was purged by the voluntariness of Yousif's consent to the search of his vehicle and the voluntariness of his statements to the police after receiving Miranda warnings.

*Constitutionality of the checkpoint program*

We review the district court's conclusions of law *de novo* and its findings of fact for clear error. See, e.g., United States v. Booker, 269 F.3d 930 (8th Cir. 2001). In Edmond, a class action brought on behalf of all motorists stopped or subject to being stopped at the Indianapolis drug checkpoints, the Supreme Court held that the Indianapolis checkpoint program violated the Fourth Amendment because it operated for the purpose of uncovering evidence of ordinary criminal wrongdoing (drug trafficking) without individualized reasonable suspicion. The Sugar Tree Road checkpoint program, as it was operated in the present case, similarly violated the Fourth Amendment insofar as its primary purpose was the interdiction of drug trafficking (which the government concedes) and the officers operating the Sugar Tree Road checkpoint were under instructions to stop *every* vehicle that took the Sugar Tree Road exit. While the checkpoint at issue in the present case differs from the checkpoint at issue in Edmond in that the MHP used signs to suggest to drivers that taking the Sugar Tree Road exit was a way to *avoid* a police checkpoint, the mere fact that some vehicles took the exit under such circumstances does not, in our opinion, create individualized reasonable suspicion of illegal activity as to every one of them. Indeed, as the government's evidence indicated, while some drivers may have wanted to avoid being caught for drug trafficking, many more took the exit for wholly innocent reasons – such as wanting to avoid the inconvenience and delay of being stopped or because it was part of their intended route. See Mag. Rep. I at 2-3.[3]

---

[3]According to statistical evidence presented by the government, during 54 randomly selected days in 1997, a total of 2,537 vehicles were stopped at the Sugar Tree Road checkpoint. More than half (1,755) were driven by persons engaged in local motor vehicle traffic and, from those, 45 persons were detained and 4 were issued summonses for law violations. From the 644 vehicles that were not engaged in local traffic, 501 arrests occurred, including 395 arrests for drug violations – of which 339 were for misdemeanors. From the 2,537 vehicles stopped, 42 "loads" of controlled substances (i.e., amounts apparently intended for distribution as opposed to personal use) were discovered. See United States v. Yousif, 4:00 CR 208, slip op.

General profiles that fit large numbers of innocent people do not establish reasonable suspicion. See, e.g., United States v. Eustaquio, 198 F.3d 1068, 1071 (8th Cir. 1999) (Eustaquio). Without first stopping the vehicles and questioning the drivers, the police had no way to determine why any particular vehicles were exiting at the Sugar Tree Road ramp. Finding a quantum of individualized suspicion only *after* a stop occurs cannot justify the stop itself. "That result would have the same essential vice as a proposition we have consistently rejected – that a search unlawful at its inception may be validated by what it turns up." Wong Sun, 371 U.S. at 484.

*Individualized reasonable suspicion to justify the stop*

The government nevertheless argues that, even if the Sugar Tree Road checkpoint was generally illegal under Edmond, the totality of the circumstances noted by Lisenbe prior to the stop of Yousif's vehicle sufficed to create individualized reasonable suspicion, thereby rendering the stop in this particular case constitutionally permissible. The government emphasizes that Yousif was driving on a highway that was known to be used for drug trafficking, his car had out-of-state license plates, he pulled off at a rural exit immediately after seeing signs warning of a drug checkpoint ahead, and he slowed almost to a complete stop upon seeing the police checkpoint ahead. Brief for Appellee at 18, 20.

"Stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." Delaware v. Prouse, 440 U.S. 648, 653 (1979). Where law enforcement officers are not acting for a special purpose such as patrolling the borders or roadway safety, it is unreasonable

at 2-3 (E. D. Mo. Sept. 15, 2000). Apparently no evidence was provided by the government as to the number of actual convictions resulting from the 395 drug-related arrests.

under the Fourth Amendment to stop a vehicle and detain its driver to check his or her license and registration, unless the officers have at least articulable and reasonable suspicion that the driver is not licensed, that the automobile is not registered, or that the automobile or one of its occupants is otherwise subject to seizure for a violation of the law. Id. at 663. In the present case, the stop and detention of Yousif's vehicle was therefore unreasonable under the Fourth Amendment unless Lisenbe had such reasonable and articulable suspicion before he executed the stop. The facts that Yousif's vehicle had out-of-state license plates and was traveling on a highway that was "known" to the officers as a drug trafficking corridor cannot alone justify the stop because "[t]oo many people fit this description for it to justify a reasonable suspicion of criminal activity." United States v. Gray, 213 F.3d 998, 1001(2000) (Gray) (quoting Eustaquio, 198 F.3d at 1071). As to the additional facts that Yousif took an exit just past the ruse checkpoint warning signs and then slowed down upon observing the actual checkpoint, we are chary to conclude that these provide sufficient additional circumstances to justify the intrusion. We first note that these circumstances never would have arisen but for the existence of the illegal checkpoint. Moreover, because there is nothing inherently unlawful or suspicious about a vehicle (even one with out-of-state license plates) exiting the highway, it should not be the case that the placement of signs by the police in front of the exit ramp transforms that facially innocent behavior into grounds for suspecting criminal activity. Reasonable suspicion cannot be manufactured by the police themselves. Cf. Wong Sun, 371 U.S. at 485 ("A contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves have provoked."). Finally, the checkpoint was not where the police signs indicated it would be and, therefore, any motorist would likely be surprised upon discovering it. Under such circumstances, even an innocent traveler might be inclined to hesitate out of surprise, annoyance, or nervousness. We believe that Yousif's hesitancy, while relevant, is materially distinguishable from the conduct that was at issue in Wardlow, 528 U.S. at 124, where the defendant engaged in "unprovoked flight upon seeing the police." See also United States v. Clay, 640

-12-

F.2d 157, 160 (8th Cir. 1981) ("The government's emphasis that appellant's 'hesitancy' created individualized suspicion falls far short of those cases dealing with flight."). In sum, giving due regard to the general expertise and specific knowledge of the law enforcement officers involved, we nevertheless hold that the totality of the circumstances cited by the government did not support a reasonable suspicion, prior to the stop, that Yousif was engaged in criminal activity.[4] Cf. Gray, 213 F.3d at 1000-01 (holding that reasonable suspicion finding was not supported by the totality of circumstances cited by the government, including facts that the defendant was standing on the street in a high-crime area at night, in cold weather, and hurried across the street upon seeing law enforcement officers). We hold that the initial stop and detention of Yousif's vehicle and its occupants constituted an unlawful seizure under the Fourth Amendment.

*Voluntariness of consent to search*

Evidence that is the "fruit" of an illegal search or seizure is not admissible, and "[t]he exclusionary prohibition extends as well to the indirect as the direct products of such invasions." Wong Sun, 371 U.S. at 484-85. The controlling question is "'whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Id. at 488 (citation omitted). In the present case, the district court held that the exclusionary rule

---

[4]By contrast, in a recent 4-3 decision, the Missouri Supreme Court distinguished a ruse checkpoint similar to the Sugar Tree Road checkpoint from the drug checkpoints at issue in Edmond and held that police officers did not violate the defendant's Fourth Amendment rights when they stopped his vehicle at a ruse checkpoint. State v. Mack, 66 S.W.3d 706 (Mo. 2002) (en banc). The Missouri Supreme Court concluded that the officers who carried out the stop had the necessary quantum of individualized suspicion, based in large part upon the reasoning that all drivers transporting drugs would exit the highway in order to avoid police detection. Id. at 709-10.

did not apply to the evidence at issue, notwithstanding the initial illegal seizure, because Yousif "freely gave his consent" to the search of his vehicle, thereby purging the taint of the constitutional violation. District court order at 3 (adopting the magistrate judge's factual findings with respect to Yousif's consent, and holding that the evidence in question would not be suppressed). Yousif argues that the district court clearly erred in holding that his consent to the search was "voluntary." He further contends that there were insufficient intervening events or attenuating circumstances to purge the taint of the illegal seizure.

The district court's finding that Yousif voluntarily consented to search of his vehicle is reviewed for clear error. United States v. Moreno, 280 F.3d 898, 900 (8th Cir. 2002) (Moreno). It was the government's burden to prove, by a preponderance of the evidence, that Yousif's consent to the search was, in fact, voluntary in the sense that it was sufficiently an act of free will to purge the primary taint of the illegal seizure. See id. Whether consent to a search is truly an act of free will must be determined on the facts of each case, under the totality of the circumstances. Id. Our cases recognize that the following three factors should be considered: (1) the temporal proximity between the illegal search or seizure and the consent, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. Id. (citing Brown v. Illinois, 422 U.S. 590 (1975) (identifying relevant factors)).

In Moreno, 280 F.3d at 899-900, a sheriff pulled over a vehicle driven by the defendant, Moreno, because the sheriff mistakenly thought that the temporary license plates on the vehicle were invalid. After requesting a driver's license, the trooper discovered that Moreno did not have a valid driver's license. The trooper issued Moreno a ticket for driving without a valid license and asked for permission to search the vehicle. At the suppression hearing, the trooper testified that he told Moreno that he did not have to consent to the search and that he even advised Moreno to refuse to consent if there were drugs in the vehicle. See id. at 900 (quoting the trooper's

testimony: "What I always tell them, if ya, if ya have drugs in your car, don't, don't consent to a search"). Moreno consented to the search, and the trooper's initial search turned up nothing illegal. The trooper then asked for, and Moreno provided, permission to have the vehicle towed and searched further. A second search at a service station yielded approximately 4 kilograms of methamphetamine hidden inside the vehicle. Upon being charged with possession with intent to distribute, Moreno moved to suppress the drugs. The district court determined that the sheriff, who was simply unfamiliar with the temporary tags at the time of the initial stop, lacked articulable reasonable suspicion of unlawful conduct and, therefore, stopped the vehicle in violation of Moreno's Fourth Amendment rights. However, the district court further concluded that Moreno's consent to the search of his vehicle was voluntary and purged the taint of the illegal stop. Id. at 900. On appeal, this court assumed without deciding that the initial stop was illegal because that determination was not disputed by the government. Id. at 900 n.4. The only question was whether the district court had clearly erred in finding that the defendant had voluntarily consented to the search of his vehicle such that the taint of the illegal stop had been purged. In holding that the district court had not clearly erred, this court considered the three Brown factors mentioned above and noted, among other things, that the trooper had asked for and received consent to search the vehicle two separate times, that there was a considerable passage of time between the illegal stop and the second time the defendant gave his consent, that the trooper specifically told Moreno that he could refuse to consent to the search, and that there was no indication of bad faith or trickery, or purposeful or flagrant illegality, on the trooper's part. Id. at 901.

In applying the Brown factors to the case at bar, we note that little time elapsed between the initial stop of Yousif's vehicle and Yousif's consent to the search. Moreover, there were no significant intervening events supporting a finding of voluntariness. We disagree with the government's argument that Officer Lisenbe's statement to Yousif – that a search could be conducted if the police had consent or probable cause – was an attenuating circumstance which added to the voluntariness

of Yousif's consent. See Brief for Appellee at 24. On the contrary, a reasonable and most likely inference for Yousif to have drawn from Lisenbe's statement was that, if Yousif refused to consent to the search, the officers would search the vehicle anyway, on the basis of probable cause. Cf. United States v. Morgan, 270 F.3d 625, 631 (8th Cir. 2001) (consent held not voluntary where trooper asked for consent to search a van, and the driver said "go ahead" after the trooper stated he would walk a drug dog around the van if consent were refused). Lisenbe's statement was significantly different from the trooper's statements in Moreno, advising Moreno that he could refuse to consent to the search. Accord United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir. 1994) (finding that written consent to search was voluntary under Wong Sun, notwithstanding prior illegal detention, where "[t]he officer told [the defendant], both orally and in writing, that he did not have to sign the consent form"), cert. denied, 514 U.S. 1134 (1995). Finally, while we attribute no bad faith to the officers, we emphasize that the checkpoint program was, in its entirety, operating in violation of the law. The very purpose of the checkpoint was to root out vehicles on the road carrying illegal narcotics. Although the officers were not purposefully violating the Fourth Amendment, the search of Yousif's vehicle was carried out exactly as planned under the guidelines for the illegal checkpoint, and it can hardly be disputed that the search of Yousif's vehicle thus resulted from an exploitation of illegal circumstances. The presence of patrol cars, numerous uniformed officers, and drug dogs made the illegal circumstances flagrant, and rendered the overall atmosphere of the checkpoint intimidating and coercive. In sum, we hold that the district court clearly erred in finding, under the totality of the circumstances, that Yousif's consent to the search of his vehicle was sufficiently an act of free will to be deemed voluntary. Accordingly, we hold that Yousif's consent did not purge the primary taint of the illegal stop.

*Voluntariness of statements to police*

As stated above, Yousif also moved to suppress the statements he made to the police following the discovery of marijuana in his vehicle. The district court did not specifically decide the question of whether Yousif's statements to the police could independently be admitted if the drugs were suppressed, because the district court held that Yousif's consent to the search of his vehicle purged the taint of the primary illegality. Yousif maintains on appeal that, in addition to the marijuana found in the vehicle, his statements were fruit of the poisonous tree and subject to exclusion notwithstanding his waiver of <u>Miranda</u> rights. He argues, among other things, that a <u>Miranda</u> warning will not always break the causal connection between a Fourth Amendment violation and a confession. <u>See</u> <u>Brown v. Illinois</u>, 422 U.S. 590, 603 (1975).

Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search. <u>Wong Sun</u>, 371 U.S. at 485 ("the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects'"). In the present case, the lower courts' findings indicate that there were intervening events and attenuating circumstances with respect to Yousif's statements that were not present at the time Lisenbe sought his consent to the search. Nevertheless, because the district court did not reach the question of whether Yousif's statements to the police could independently be admitted even if the drugs were suppressed, we leave it to the district court to determine in the first instance, based upon the totality of the circumstances, whether or not any or all of Yousif's statements were sufficiently acts of free will to be deemed voluntary, and whether those statements are admissible notwithstanding the initial violation of Yousif's Fourth Amendment rights.

**Conclusion**

For the reasons stated, we vacate the judgment of the district court and remand the case to the district court for further proceedings consistent with this opinion.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

I believe that it is not necessary to decide the difficult question of whether stopping Mr. Yousif's vehicle was constitutional, because it is wrong to conclude, as the court does, that the district court clearly erred in finding that Mr. Yousif's consent to the search of his vehicle was voluntary. If we had the power to review the record independently, so that we could arrive at a *de novo* conclusion on the matter of voluntariness, I might well be of the view that the motion to suppress was improperly denied. But that of course is not our role. We are to decide whether, after examining the record, we are "left with the definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

In this case, the district court heard testimony from the principals involved, and it was that court's responsibility in the first instance to decide whether Mr. Yousif's will had been overborne when he consented to the search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26, 248-49 (1973). In other words, the district court had to determine what Mr. Yousif's state of mind was at a certain time, and it will be a rare case when an objective observer could say that that determination, whichever way it went, was clearly erroneous. The instant case has a great deal in common with cases in which a court must determine whether a particular person was motivated by some kind of animus when he or she committed an act, and we know that such findings are "peculiarly within a trial judge's province." *Wainwright v. Witt*, 469 U.S. 412, 428 (1985).

Certainly there are facts in the record here that support the district court's conclusion, among the most prominent of which is that Mr. Yousif did not revoke his consent when the officer explained that a search could not legally proceed without consent or probable cause to believe that evidence of a crime would be uncovered. In any event, in the circumstances I cannot say that after examining this record I am left with a conviction that the district court's factual finding was clearly wrong.

Mr. Yousif argues that even if his consent to the search of his vehicle was voluntarily given, the law nevertheless requires suppression of the evidence because his consent was not so distinct from the unconstitutional stop as to purge the taint of the original illegality. As the court recognizes, *Wong Sun* itself established the principle that evidence that would not have been uncovered but for an unconstitutional act is admissible if its discovery is fairly attributable to some other event that acts as a kind of intervening, independent cause of the discovery. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

Some of our cases seem to proceed on the principle that a voluntary consent to a search *ipso facto* amounts to an intervening event that renders evidence admissible, even though the evidence would have not been discovered but for an illegal act of some kind. *See*, *e.g.*, *United States v. Green*, 275 F.3d 694, 700 (8th Cir. 2001); *United States v. Beason*, 220 F.3d 964, 967 (2000). Mr. Yousif criticizes these cases on the ground that they conflate two separate issues, namely, the voluntariness of the consent and the severability of that consent from the initial illegality. In other words, he says, a good argument can be made that even a voluntary consent to search will not always be a sufficiently independent act to render seized evidence admissible.

In any event, our more expansive discussions of the matter do assume that cases like the present one involve two distinct issues, namely, whether the consent to search was voluntary, and, if so, whether that consent was given in circumstances that render it an independent, lawful cause of the discovery of the relevant evidence. *See*,

*e.g.*, *United States v. Kreisel*, 210 F.3d 868, 869-70 (8th Cir. 2000), *cert. denied*, 531 U.S. 916 (2000); *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir. 1994), *cert. denied*, 514 U.S. 1134 (1995). Whatever approach one takes, however, the significant fact (as the district court recognized) is that we have never held that incriminating evidence must be suppressed as the fruit of the poisonous tree when a voluntary consent to search has intervened between an illegal stop and the discovery of that evidence. There is nothing distinctive about the present case that would serve to remove it from the usual rule. The court's holding therefore runs contrary to all of our precedents.

In sum, the evidence was admissible against Mr. Yousif even if the stop of his vehicle violated the fourth amendment. I would affirm the judgment of the district court.

I therefore respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.