# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3326

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Rafael Vega-Rico, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 15, 2005
Filed: August 10, 2005

_____

Before MURPHY, BYE, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Rafael Vega-Rico ("Vega-Rico") pled guilty in the United States District Court for the District of South Dakota[1] to illegal reentry in violation of 8 U.S.C. § 1326. However, Vega-Rico reserved the right to appeal the district court's denial of his motion to suppress statements he made to a Department of Homeland Security ("DHS") agent. We affirm.

_____

[1]The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota.

# I. *Background*

Officer Brad Parker ("Officer Parker") of the Yankton Police Department in South Dakota stopped a vehicle driven by Loretta Zephier ("Zephier"). Officer Parker issued Zephier a courtesy warning for failing to signal a lefthand turn. Zephier informed Officer Parker that her driver's license was either revoked or suspended and that the vehicle belonged to Vega-Rico, who at the time of the stop was a passenger in the back seat. While Officer Parker called dispatch for information regarding Zephier's license status, Officer Jason Foote ("Officer Foote"), along with Rex, a dog in Officer Foote's canine unit, arrived on the scene as routine backup. At the time of Zephier's stop, Officer Foote was not involved in any drug investigation and it was only happenstance that Officer Foote was in a canine unit.

While Officer Parker interviewed Zephier, Officer Foote approached and identified the three passengers in the vehicle. Officer Foote walked Rex around the exterior of the vehicle after the passengers had exited. Rex alerted to the gas fill area on the driver's side of the vehicle. A search of this area revealed no drugs. Officer Foote then put Rex in his patrol vehicle and searched the interior of the vehicle, including the glove box. When Officer Foote located nothing in the interior of the vehicle, he retrieved Rex and put Rex in the backseat of the vehicle. Rex then went to the front seat of the vehicle and indicated to the glove box. This time, Officer Foote found leaves and stems of marijuana in the back corner of the glove box.

Officer Foote then asked Vega-Rico if he had anything illegal on his person. Officer Foote arrested Vega-Rico and attempted to read *Miranda* rights to him in English, but Vega-Rico could not understand them. Vega-Rico was then searched. Officer Foote found an expired resident alien card and Vega-Rico was placed on deportation hold.

The Yankton Police Department advised DHS Agent Kenneth Baird ("Agent Baird") that Vega-Rico was in their custody. Agent Baird began an investigation to

determine Vega-Rico's alien status and also obtained booking information from the Yankton Police Department, including Vega-Rico's fingerprints. This investigation revealed that a person with Vega-Rico's identity had been previously deported. Agent Baird informed the Yankton Police Department that he would be picking up Vega-Rico.

Agent Baird transported Vega-Rico to the Sioux Falls Immigration Office where he was fingerprinted. Agent Baird conducted a query of the Automated Fingerprint Identification System Database and verified that Vega-Rico had been previously deported. Agent Baird gave Vega-Rico *Miranda* warnings in Spanish, which Vega-Rico understood. Vega-Rico agreed to speak with Agent Baird, and in a fifteen-minute interview, also conducted in Spanish, revealed his date and place of birth and the names of his parents. Vega-Rico also admitted to two prior deportations, two criminal convictions, and his failure to receive permission to return to the United States. Agent Baird did not reveal to Vega-Rico the information he had on file regarding the deportations prior to or during the interview.

Vega-Rico brought motions to suppress the evidence obtained from the vehicle stop and, most relevant to this appeal, his post-*Miranda* statements to Agent Baird. The magistrate judge denied the motions. The district court reversed in part, and held that the search of Vega-Rico's vehicle violated the Fourth Amendment because Rex was not sufficiently reliable for drug detection. The district court then suppressed all evidence, except Vega-Rico's post-*Miranda* statements to Agent Baird. The district court held that his statements to Agent Baird were sufficiently an act of free will to purge the primary taint of the Fourth Amendment violation. Vega-Rico now timely appeals the denial of the motion to suppress his statements to Agent Baird.

II. *Discussion*

We review the motion to suppress de novo, but review the district court's factual findings in deciding the motion for clear error. *United States v. Yousif*, 308

F.3d 820, 827 (8th Cir. 2002). Evidence that is the "fruit" of an illegal search or seizure is not admissible, and "[t]he exclusionary prohibition extends as well to the indirect as the direct products of such invasions." *Wong Sun v. United States,* 371 U.S. 471, 484–85 (1963). "Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." *Yousif,* 308 F.3d at 832 (citing *Wong Sun,* 371 U.S. at 485 ("the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects'")). Therefore, "[s]tatements that result from an illegal detention are not admissible." *United States v. Hernandez-Hernandez*, 384 F.3d 562, 565 (8th Cir. 2004) (citing *United States v. Ramos,* 42 F.3d 1160, 1164 (8th Cir. 1994)). To break the causal chain between an illegal arrest and a statement given later, the statement must be "sufficiently an act of free will to purge the primary taint." *Ramos*, 42 F.3d at 1164 (quoting *Wong Sun,* 371 U.S. at 486).

"The giving of *Miranda* warnings, followed by the making of a voluntary statement, does not, in and of itself, mandate a statement's admissibility." *Ramos*, 42 F.3d at 1164 (citing *Brown v. Illinois*, 422 U.S. 590, 602 (1975). "Instead, to decide whether a confession is the product of a free will, [we] consider *Miranda* warnings, the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct." *Hernandez-Hernandez*, 384 F.3d at 565; *see also Brown*, 422 U.S. at 602. The denial of a motion to suppress must be affirmed "unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." *Hernandez-Hernandez*, 384 F.3d at 564–65. Vega-Rico contends the government failed to carry its burden to show his statements to Agent Baird were the result of an act of free will.

This case tracks the facts of *Hernandez-Hernandez*, where defendant was arrested after he revealed during a traffic violation that he was working during his immigration status. *Id.* at 564. Defendant was then transferred to the custody of Immigration and Naturalization Service ("INS") agents. *Id.* After being given *Miranda* warnings and signing an advice of rights form, defendant admitted to INS agents that "he had been deported six or seven months earlier, and had reentered the United States illegally a couple of months later." *Id.* The district court denied defendant's motion to suppress the statements after it had been determined that defendant was illegally detained. *Id.* We affirmed the denial of the motion to suppress, reasoning that

> the INS questioning was conducted five days after the initial questioning . . . and there is no evidence Hernandez-Hernandez was questioned or coerced during those five days in jail. Further, the INS questioning was conducted at the INS office, not at the scene of the first round of questioning, and was conducted by an INS agent who had no involvement in the earlier questioning. Finally, the INS agent did not treat his questioning as continuous with the earlier questioning during the traffic stop. The different methods and distant timing of the interrogations do not indicate intentional, calculated conduct by the authorities.

*Id.* at 566.

In this case, Vega-Rico's post-*Miranda* statements were made four days after the Fourth Amendment violation occurred. The interview was conducted in a different city by an agent from a separate law enforcement agency, and neither agent nor agency had any involvement in the initial Fourth Amendment violation. The interview was conducted for purposes unrelated to the circumstances surrounding the Fourth Amendment violation. In addition, the official misconduct in this case—reliance on an unreliable drug-snffing dog—was not flagrant. While Vega-Rico incorrectly

-5-

argues that the statements would only be free of taint if they were made after he was released and then voluntarily returned to the DHS, relevant precedent says otherwise. *See Hernandez-Hernandez*, 384 F.3d at 564–67.

Vega-Rico also argues that *Hernandez-Hernandez* was decided under the Fifth Amendment rather than the Fourth Amendment's exclusionary rule. We disagree, as *Hernandez-Hernandez* relied upon *Ramos* and *Yousif*, which analyzed the admissibility of Hernandez-Hernandez's statements under the test set forth in *Wong Sun* and *Brown*, all of which were cited by Vega-Rico in support of his motion to suppress. We affirm the district court's denial of Vega-Rico's motion to suppress his statements to Agent Baird.

BYE, Circuit Judge, concurring.

I concede that United States v. Hernandez-Hernandez, 384 F.3d 562 (8th Cir. 2004) controls the outcome of the present case, but I write separately to voice my disagreement with its holding. Initially, something must be said in regards to the court's confusing analysis in Hernandez-Hernandez. The court began by classifying the issue as one involving an illegal detention in violation of the Fourth Amendment. Id. at 565. The court then, after acknowledging the district court's application of factors relevant to a Fourth Amendment analysis (Ramos factors), id., proceeded to analyze the case as one controlled by the Fifth Amendment, id. at 565-67 (discussing the Fifth Amendment cases of Oregon v. Elstad, 470 U.S. 298 (1985) and Missouri v. Seibert, 124 S. Ct. 2601 (2004)). The court completed its discussion by inexplicably concluding factors seemingly relevant to the Fourth Amendment intervened between the unwarned questioning (i.e., a Fifth Amendment Miranda issue) and the subsequent postwarning statements. Id. at 567.

This confusing analysis prompted Vega-Rico to argue Hernandez-Hernandez was decided under the Fifth Amendment's exclusionary rule rather than the Fourth

Amendment's. If Vega-Rico is correct, <u>Hernandez-Hernandez</u> would not be controlling or persuasive because the Fourth Amendment requires a broader application of the exclusionary rule and a more exacting standard to purge the taint of a violation. <u>United States v. Fellers</u>, 397 F.3d 1090, 1094-95 (8th Cir. 2005). My careful reading of the opinion, however, does not support Vega-Rico's position. In my view, <u>Hernandez-Hernandez</u> was an illegal detention case.[2] Although the court in <u>Hernandez-Hernandez</u> did not explain clearly why or how the defendant was illegally detained in violation of the Fourth Amendment, it presumably occurred when the trooper exceeded the scope of the traffic stop. <u>Id.</u> at 564. The unwarned statements made to the trooper and later to the border patrol agent were fruits of this unconstitutionally prolonged traffic stop. On appeal, the government apparently conceded, and rightfully so, the inadmissability of these statements, which were made contemporaneously to the initial illegal detention and without the prophylactic warnings of <u>Miranda</u>. The government, however, did not concede the inadmissability of postwarning statements made five days after the initial illegal detention to a different border patrol agent at his INS office.

Without this concession, the court held the five-day delay between the initial illegality and the postwarning statement, along with the change in interrogating location and personnel were sufficient intervening circumstances to purge the taint of the initial illegality. <u>Id.</u> at 567. This holding has served to whittle away important

---

[2]Admittedly, certain statements within the opinion cause me to question my view. Particularly, the court's reference in the concluding paragraph to unwarned questioning, rather than an illegal detention, as the event which triggered the need to purge the taint. Unwarned questioning is, of course, not a violation of the Fourth Amendment, but a violation of the <u>Miranda</u> warnings designed to protect Fifth Amendment rights. This reference to unwarned questioning was also preceded by a discussion of Fifth Amendment case law and by a statement on how the <u>Seibert</u> factors were similar to the <u>Ramos</u> factors. <u>Id.</u> at 566. Thus, I think it conceivable that the court's analysis was a Fifth Amendment voluntariness inquiry which looked similar to, but was not, a Fourth Amendment analysis under <u>Ramos</u>.

constitutional protections by ignoring a key constitutional fact and by expanding the definition of intervening circumstances to include unilateral acts of law enforcement.

The court's holding first whittled away important constitutional protections by overlooking the fact that the five-day interval between the Fourth Amendment violation and the postwarning statements was spent in custody. Id. at 564. This prolonged five-day period of incarceration cuts against the confession being of free will and constitutes a more serious violation than the initial illegal seizure. Dunaway v. New York, 442 U.S. 200, 220 (1979) (Stevens, J., concurring). In fact, "where no intervening circumstances are present, a long and illegal detention may in itself impel the defendant to confess." People v. White, 512 N.E.2d 677, 688 (Ill. 1987). During this five-day period of isolation, Hernandez-Hernandez had little or no contact with anyone other than law enforcement. This isolation and other jailhouse conditions are less than ideal for the rational decision-making processes required to decide voluntarily and intelligently whether to confess. Cf. Clewis v. Texas, 386 U.S. 707, 712 (1967). Thus, without an intervening circumstance, a court must assume the confession was, at least in part, prompted by these less than ideal jailhouse conditions. Dunaway, 442 U.S. at 220 (Stevens, J., concurring).

The court then further whittled away important constitutional protections by expanding the definition of intervening circumstances to include unilateral acts of law enforcement. Prior to Hernandez-Hernandez I can find no other court which held unilateral acts of law enforcement to be intervening circumstances. See, e.g., Taylor v. Alabama, 457 U.S. 687, 692-93 (1982) (rejecting an arrest warrant obtained by law enforcement ex parte as an intervening circumstance). All other intervening circumstance cases focus on the conduct of the suspect as in Wong Sun v. United States, 371 U.S. 471, 491 (1963), or the on the actions of a neutral party such as the judiciary as in Johnson v. Louisiana, 406 U.S. 356, 365 (1972). Despite the government's contention otherwise, the INS agent's actions in seizing Hernandez-Hernandez and transporting him to another location for additional investigatory

interrogation did not purge the taint of the initial constitutional violation, but exasperated it. In other words, the perpetrators of an illegal search or seizure tagging off to an agent from a different law enforcement agency is not an intervening circumstance, not an act of free will sufficient to purge the taint of an initial Fourth Amendment violation. White, 512 N.E.2d at 689. This is practically black letter law. See 6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.4(b), at 298 (4th ed. 2004). Thus, even in the absence of flagrant official misconduct, the government's failure to show an intervening act of free will on the part of Hernandez-Hernandez required suppression of his postwarning statements which were proximately caused by the Fourth Amendment violation. But, even though I disagree with its holding, I find Hernandez-Hernandez indistinguishable from the present case. I therefore reluctantly concur in the judgment of the majority.

_____